682 A.2d 1257

**HERSHEY CHOCOLATE CO., Appellant,**

v.

**COMMONWEALTH of Pennsylvania, Workmen's Compensation Appeal Board and Tania L. Lasher, Appellees.**

Supreme Court of Pennsylvania.

Argued Jan. 25, 1996.

Decided Sept. 19, 1996.

28

Bruce D. Bagley, Harrisburg, for appellant.

Martin Singer, Pittsburgh, for appellee Tania L. Lasher.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and NIGRO, JJ.

## *OPINION*

ZAPPALA, Justice.

Hershey Chocolate Company (Hershey) appeals from the order of the Commonwealth Court affirming the award of workers' compensation benefits to Tania Lasher for a psychic injury claimed to have been caused by her employment as a district manager. The issue presented in this appeal is whether the evidence was sufficient to prove that the psychic injury resulted from abnormal working conditions. We hold that the Commonwealth Court erred in finding that Lasher suffered psychic injury as a result of abnormal working conditions and reverse.

Lasher began her employment with Hershey on May 5, 1979, in the position of sales representative for an area including Johnstown, Somerset, and Indiana. In July 1980, Lasher became a district account supervisor with responsibility for direct buying customers and a greater dollar volume in Altoona, State College, Huntingdon, and DuBois. Her position involved contact of key accounts in that area and expanded her responsibilities to include the hiring, training, and supervision of a part-time sales representative who called on the convenience store trade.

In 1984, Lasher was promoted to district manager for the Pittsburgh district. The district extended south to Wheeling, West Virginia and west to Steubenville, Ohio. She was responsible for the district's annual gross sales of $20,000,000. Sales were made to supermarkets, drugstores, candy and tobacco distributors, and mass merchandisers.

As Pittsburgh district manager, Lasher supervised five full-time employees, including an individual who filled her previous position as the district account supervisor, and four sales representatives. In addition, five part-time employees worked under her. Lasher assumed responsibility for the hiring and

training of those employees. She handled two accounts personally.

In 1987, Hershey restructured several districts.[1] Restructuring took place in Cleveland, Detroit, and Pittsburgh in the mideast division, and outside the division in St. Louis, Baltimore, and Washington. This resulted in a merger of the Pittsburgh and Parkersburg districts.

Lasher was interested in the position of district manager for the larger district, which was called the Pittsburgh district after the merger. She was promoted to that position in July 1987. The promotion moved her from a grade 26 to a grade 28, resulting in a 9.2 percent increase in her base salary.[2] The sales territory expanded south to Elkins, West Virginia and east to State College, Pennsylvania. The sales volume of the new district was $31,500,000, making it one of the top ten districts in the country.

After the merger, Hershey provided Lasher with additional personnel. Lasher was given the assistance of Joseph Noca, a key accounts manager, and a part-time secretary.[3] Lasher's staff consisted of the key account manager, a district account supervisor, seven sales representatives, and six part-time retail merchandisers. In the chain of command, the district account supervisor was directly responsible for the six part-time employees. Lasher was personally responsible for only one account.

During the same period of time that Lasher excelled in her professional life, she faced numerous personal difficulties. Six months before her promotion, Lasher sought medical attention for fatigue and loss of energy. Lasher, who had married for the third time in 1984, lived apart from her husband during the work week. She resided in Pittsburgh while her husband

1. Nationally, Hershey's markets are divided into six divisions consisting of ninety districts. The Pittsburgh district is one of twelve districts comprising the mid-east division.

2. Bonus incentives were part of her compensation package, but were not specified in the record.

3. No other district manager was given the assistance of a key account manager.

was employed and lived in Altoona. The couple saw each other only on weekends.

Lasher experienced problems with her son from her first marriage which were compounded when he dropped out of college during the 1986–1987 school term. Illness plagued both her father and father-in-law. Her father-in-law died in February 1987. Lasher's father, described as an unpleasant alcoholic, was hospitalized that year for cirrhosis and cancer. His condition was terminal. Although Lasher had never had a close relationship with her father, she responded dutifully to his growing dependence upon her.

In November 1987, Lasher became concerned about disruptions in her sleeping patterns and worried about customers. Her personal difficulties did not abate, indeed she suffered the loss of a friend who died of cancer in January 1988. In March 1988, Lasher again returned to her personal physician with complaints that she was fatigued. The physician encouraged her to lose weight and exercise.

Although her work performance continued to receive an above average appraisal, Lasher became apprehensive about her job. On June 6, 1988, Lasher suffered from stomach pains and could not stop crying. She was examined by her gynecologist who then referred her to a medical practice where she began treatment with a psychiatrist for depression. Lasher never returned to work.

On October 21, 1988, Lasher filed a claim petition for workers' compensation benefits alleging that she suffered from a severe emotional disorder due to excess pressure and excessive work load changes in her job. After evidentiary hearings, the referee determined that Lasher had sustained her burden of proof that she became disabled on June 6, 1988, due to depression caused by a change in her working conditions and awarded benefits.[4] Notably, the referee did not make any reference to abnormal working conditions in either her findings of facts or conclusions of law.

4. This case was heard prior to the passage of Act 44 of 1993 in which the title of referee was redesignated as "workers' compensation judge." 77 P.S. § 701.

The Workmen's Compensation Appeal Board (Board) affirmed the referee's decision. The Board observed that the referee did not use the term "abnormal" in her decision, but inferred that the referee's finding that Lasher was subjected to an excessive work load meant that abnormal working conditions caused her depression. The Board dismissed Hershey's appeal. The Commonwealth Court affirmed the Board's order, with Judge Doyle dissenting. We granted Hershey's petition for allowance of appeal.

■ The scope of appellate review is limited in workers' compensation proceedings to a determination of whether constitutional rights have been violated, an error of law has been committed, or any findings of fact are supported by substantial evidence. *Volterano v. Workmen's Compensation Appeal Board,* 536 Pa. 335, 639 A.2d 453 (1994). Hershey asserts that the Commonwealth Court erred in holding that Lasher suffered a psychic injury as a result of abnormal working conditions. Hershey argues that Lasher failed to demonstrate through objective evidence that her working conditions were different or more stressful than those of other sales executives in either larger or smaller sales districts within its organization.

■ To recover workers' compensation benefits for a psychic injury, a claimant must prove by objective evidence that he has suffered a psychic injury and that such injury is other than a subjective reaction to normal working conditions. *Martin v. Ketchum, Inc.,* 523 Pa. 509, 568 A.2d 159 (1990).

■ " '[E]ven if a claimant adequately identifies actual (not merely perceived or imagined) employment events which have precipitated psychiatric injury, the claimant must still prove the events to be abnormal before he can recover.' " *Wilson v. Workmen's Compensation Appeal Board (Aluminum Company of America),* 542 Pa. 614, 669 A.2d 338 (1996), quoting *Antus v. Workmen's Compensation Appeal Board,* 155 Pa. Cmwlth. 576, 586, 625 A.2d 760, 766 (1993), aff'd. per curiam, 536 Pa. 267, 639 A.2d 20 (1994).

■ Hershey does not dispute that the first part of the *Martin* test was met in this case. The issue is whether there was sufficient evidence to prove that the psychic injury suffered by Lasher was caused by abnormal working conditions.

■ "[P]sychic injury cases are highly fact-sensitive and for actual work conditions to be considered abnormal, they must be considered in the context of the specific employment." *Id.*, 542 Pa. at 624, 669 A.2d at 343 (citation omitted). Appellate review of the referee's findings of fact is limited to a determination of whether the findings are supported by the evidence as a whole. Where no additional testimony is taken before the Board, the findings will be overturned only if arbitrary and capricious. Whether the findings of fact support a conclusion that the claimant has been exposed to abnormal working conditions is a question of law, however, that is fully reviewable on appeal. *Id.*, 542 Pa. at 624, 669 A.2d at 343.

During the hearings before the referee, Lasher described her nine year employment history with Hershey. Her account details a successful career with the company where she began working as a sales representative and received several promotions over a period of time. Her responsibilities changed with each successive position. The first promotion to district account supervisor occurred approximately one year after she was hired. She became responsible for key accounts and a larger dollar volume in the market for direct buying customers.

Her next promotion to district manager for Pittsburgh came in 1984. As district manager, Lasher was responsible for a sales volume of $20,000,000 and she supervised a sales force consisting of five full-time and four part-time employees. In 1985, a full-time salesperson was added to her team. Lasher had complete responsibility for interviewing, hiring, and training personnel for the Pittsburgh district. After an initial twelve week training period, she worked with the sales representatives in the field one or two days in each cycle of twenty business days. Her supervisory duties were only a part of her

responsibility for the district. She handled two accounts, one of a supplier to a major chain of supermarkets and the other for Giant Eagle supermarkets, which was the biggest account in her entire region.

Lasher continued as district manager for three years until Hershey decided to restructure the districts. In July 1987, the Pittsburgh district was combined with the Parkersburg district. The Parkersburg district had been poorly managed resulting in dissatisfied customers and useless inventory. The position of district manager for the newly merged districts was given to and accepted by Lasher.

Lasher testified that the nature of her responsibilities as district manager for the merged district did not change, but that the sales volume and number of personnel required to support those sales increased.

Q. Did you, in terms of your actual duties performed, what was the change that occurred after the reorganization of July, 1987? What did you do after July that you didn't do before?

A. I had more responsibility. I inherited a district that was empty. I had a phenomenal amount of cleanup work to do because of the poor business decisions that had been made in that district prior to my inheriting it.

Q. Your job description of your job duties did not change at all, did it, with the reorganization?

A. The duties?

Q. Yes.

A. I don't understand.

Q. Do you know whether you had a job description?

A. Sure.

Q. And the job description did not change as a result of the reorganization?

A. It didn't change for anybody across the country.

Q. All right.

> A. No matter how many people they had, it would be the same job description. If you call personnel, they'll send it to you.
>
> Q. And, in fact, when the reorganization occurred you were promoted at that time from a grade 26 to a grade 28, is that correct?
>
> A. Yes.
>
> Q. And when you were promoted, you did not indicate to any—to your supervisors that you didn't want the promotion, did you?
>
> A. No, I wanted it.

R. 33a–34a.

Before the merger, the Parkersburg district had $9,000,000 in annual sales that were handled by one district manager and one sales representative. The understaffing of the district had created the problems that Lasher was promoted to overcome. Lasher testified that she hired three new sales representatives over the next ten months to handle the increase in the number of accounts resulting from the merger. Lasher received additional support from a key account manager and a secretary. She was the only district manager for Hershey who had the assistance of both.

Lasher did not testify as to the reasons for the restructuring of the districts. Nor was any evidence offered by Lasher to establish that the responsibilities of the district manager of the merged district were different than those of district managers in districts of comparable geographical size, number of personnel, or volume of sales.

Patrick M. Brewer, the mid-east division manager, testified on behalf of Hershey. Brewer explained that he was responsible for the mid-east division which consisted of three regions, Cleveland, Detroit, and Cincinnati. Those regions were comprised of twelve districts, including Lasher's district, with sales in excess of $230,000,000 and seventy-five full-time and seventy-five part-time employees. Brewer, who became the mid-east division manager in September 1984, was involved in the restructuring of the Pittsburgh and Parkersburg districts.

Brewer testified that Hershey examined the divisions on an ongoing basis and that restructuring districts is a frequent process because of the nature of the consumer products business. In 1987, Hershey restructured work within the mid-east division, specifically the Cleveland and Detroit markets, and outside of his division in St. Louis, Baltimore, and Washington. Brewer explained that various possibilities were considered before the Pittsburgh and Parkersburg districts were merged.

Q. * * * When Miss Lasher was given the responsibility of two districts combined, were there other changes that were made with regard to Miss Lasher's responsibilities?

A. During that time frame, we had made several different proposals and recommendations and what had occurred in and around that time frame was we received for Pittsburgh a new authorization for what we call a district account supervisor. We had a very capable individual that was relocating into Pittsburgh so we gained an authorization as a result of this. That person was responsible for what we call our part time or our RTM's. Also we created the position of key account manager which Mr. Noca who, I believe, has testified before, was given the responsibility and we outlined some of the different things that we saw for the key account manager to do. We also—Tania up to that time was in an office rental situation with, I believe, telephone answering and some secretarial. Also, during this time, we were able to get Tania her own office and a part time secretary.

R. 93a.

Brewer identified other districts within the mid-east division that he referred to as "super districts," which had sales volumes in excess of $25,000,000 and employed five or six full-time employees. The super districts typically encompassed a geographical area in which a major city was located. He estimated that there were ten super districts in the United States.

In his division, the Detroit district and the Cleveland district fell within that category. The Detroit district employed six or seven full timers and twelve part timers; in 1987, the Cleveland district had seven or eight full timers. Outside of the mid-east division, the Philadelphia district was handled with seven or eight full timers. The number of personnel employed in districts comparable in size and volume of sales to the merged district corresponded with Lasher's staff.

Dr. Robert Slayton, a Board certified psychiatrist who treated Lasher, diagnosed her as suffering from major depression. He testified that based on Lasher's account of her responsibilities, the job was excessively demanding. Slayton described Lasher as "a very conscientious, maybe over conscientious, somewhat obsessive workaholic who was very dedicated to Hershey and very involved with her career." Slayton conceded that he had never spoken with anyone from Hershey about her work situation and that his conclusions with regard to her employment conditions were based entirely on Lasher's own perceptions. He dismissed any possibility that the personal difficulties that Lasher experienced around the time of her promotion had led to her depression.

Dr. David Spence, a psychiatrist who testified on behalf of Hershey, also diagnosed her as suffering from major depression. He similarly described Lasher as a "very conscientious, obsessive, compulsive individual who needs attention, who is trying her level best to do a job that everybody will admire and will cause them to like her." Spence indicated that she tended to be highly self-critical and vulnerable to criticism. He concluded, however, that the stresses in her personal life played a significant role in her "burn out" and that she overreacted to perceived criticism of her work performance.

The referee determined that Lasher had sustained her burden of proof that she became disabled on June 6, 1988, due to depression caused by a change in her working conditions based on the following findings of fact.

*SIXTH:* In July, 1987, the Pittsburgh District was merged with another District. The new District now included the

area of Elkins, West Virginia through State College, Pa. The combined District had a volume of 31,500,000 in sales. The claimant now supervised nine full-time sales representatives directly and six part-time sales representatives. Since April, 1987, the claimant was responsible for two accounts from the new District.

**SEVENTH:** The new District which was merged with the Pittsburgh District was in poor condition. The claimant had to dispose of old products and hire and train three full-time sales persons.

**EIGHTH:** Although the newly created District was not the largest District, either in sales or in personnel, the merger did result in an increased work load both in terms of personnel and sales. The claimant increased her hours from 55 hours per week to 70 hours per week.

\*     \*     \*     \*     \*     \*

**SIXTEENTH:** This Referee finds based on the credible testimony of the claimant, Joseph Noca and Patrick Brewer that, in July, 1987, the claimant experienced a change in her working conditions which resulted in an increased workload. This Referee also based on the credible testimony of the claimant finds that the increase in the claimant's workload, resulted in an excessive workload for the claimant.

The Board affirmed the referee's decision based upon her findings that Lasher experienced a change in working conditions that resulted in an increased workload and that the increase was an excessive workload. The Board cited the Commonwealth Court's decision in *Berardelli v. Workmen's Compensation Appeal Board (Bureau of Personnel, State Workmen's Insurance Fund)*, 134 Pa.Cmwlth. 450, 578 A.2d 1016 (1990), allocatur denied, 527 Pa. 625, 592 A.2d 46 (1991), for the proposition that a change of duties coupled with an increase of responsibilities can constitute abnormal work conditions.

In *Berardelli*, the claimant had been employed as a file clerk with the State Workmen's Insurance Fund (SWIF). Her responsibilities included typing, filing forms, and conduct-

ing investigations of claims. When the entire SWIF office experienced a gradual increase in work load, the claimant became prone to spontaneous outbursts of tears and anxiety attacks. The claimant filed a claim petition for workers' compensation benefits alleging that she had developed severe stress and anxiety as a result of the increase in her work load. The referee awarded benefits finding that she had suffered a traumatic stress disorder as a result of the increased work load, pressures, and stresses of her job. The Board reversed on the basis that the claimant had failed to prove that the events leading to her condition were (1) "actual," rather than a matter of her perception, and (2) "abnormal" enough not to render her injury a subjective reaction to normal work conditions.

The Commonwealth Court affirmed the Board's decision, finding that although the record established that the claimant's work load had increased prior to her injury, there was no evidence that the increase was an abnormal working condition. The court stated,

> Our discussion of "abnormal" working conditions has often centered around the pinpointing of a sudden change or unusual event in the work place. In the instant case, the record supports the findings that the increase in Claimant's work load occurred gradually. Also, there is no objective evidence in the record indicating that increases in work load are unusual for Claimant's position.

> This Court has also evaluated the abnormality of work conditions by comparing them to the work conditions of fellow employees performing similar duties, finding no abnormality if their work conditions are also similar. Here, Claimant has not distinguished her work duties from her fellow employees enough to render such a comparison invalid. The record shows that although Claimant's work load had increased, so had the work loads of *all* of the employees at [SWIF].

134 Pa.Cmwlth. at 457, 578 A.2d at 1019 (emphasis supplied) (citations omitted).

On the appeal in this case to the Commonwealth Court, Hershey argued that *Berardelli* was controlling. The court disagreed, stating that Lasher had proven that she suffered a psychic injury that could be pinpointed to the events of July 1987. The court reasoned that substantial evidence existed in the record to support the conclusion that the creation of the merged Pittsburgh district in July 1987, was an actual extraordinary event that caused Lasher's psychic injury.

The court found that to be a sufficient basis to award benefits, stating:

> This Court has adopted the following test for determining whether a psychiatric injury is compensable. [W]hen there is no physical injury as precursor to the mental injury, ... the claimant must prove either (1) that actual extraordinary events occurred at work which caused the trauma and that these specific events can be pinpointed in time, or (2) that abnormal working conditions over a longer period of time caused a psychiatric injury.

*Hershey Chocolate Co. v. Workmen's Compensation Appeal Board (Lasher)*, 162 Pa.Cmwlth. 23, 28–29, 638 A.2d 336, 339 (1994) (citation omitted).

We find that the Commonwealth Court erred in concluding that Lasher had met her burden of proving that she was subjected to abnormal working conditions based on the "objective test" it described. In our recent decision in *Philadelphia Newspapers, Inc. v. Workmen's Compensation Board (Andrew Guaracino)*, 544 Pa. 203, 675 A.2d 1213 (1996), we rejected the notion that the Commonwealth Court had developed an "objective test" for determining whether a psychic injury was compensable that would modify the test established by this Court in *Martin*. We stated,

> The Commonwealth Court essentially has identified two different impetuses that trigger psychic injury in the absence of a physical stimulus—either a specific extraordinary event or abnormal working conditions of a longer duration. The parties interpret this "objective test" as supplementing the standard of proof established in *Martin* for claimants

seeking benefits for psychic injury resulting from mental stimulus. However, we do not view the Commonwealth Court's description of psychic injuries as emanating from either a specific extraordinary event or abnormal working conditions over time to establish an additional standard or burden of proof. Although it has been referred to by the Commonwealth Court as an objective test, the description is merely an exemplification of *Martin*. The *Martin* standard is unchanged.

544 Pa. at 214–15, 675 A.2d at 1219.

■ "A claimant may recover workers' compensation benefits for psychic injuries only when the claimant proves the events to be abnormal." We find that while Lasher identified actual employment events that occurred in July 1987 when she was promoted to district manager of the merged district, she failed to establish that the events were abnormal working conditions. We conclude that the evidence was insufficient to establish that Lasher's psychic injury was other than a subjective reaction to normal working conditions. Lasher's promotion naturally entailed greater responsibility with a larger support staff and resulted in an increase in compensation commensurate with her advancement. Changed working conditions are not synonymous with "abnormal working conditions", especially in the context of a promotion. Indeed, in *Wilson* we rejected the argument that abnormal working conditions should be interpreted to include any actual change in employment conditions that result in psychic injury. *Id.*, 542 Pa. at 629, 669 A.2d at 346.

■ Lasher argues that the *Martin* standard does not require her to introduce evidence of the working conditions of other managers and that the testimony that she took on new duties with the merger of the two districts as well as an increased workload is sufficient to sustain her burden of proof. We disagree. Where an increase or change in workload and responsibilities accompanies a promotion or job change, a claimant must establish that the increase or change is abnormal. Furthermore, whether actual work conditions are to be

considered as abnormal following a promotion must be determined by reference to the job that the claimant has advanced to, not by comparison to the claimant's former responsibilities.

The order of the Commonwealth Court is reversed.

NEWMAN, J., did not participate in the consideration or decision of this case.

NIX, Former C.J., did not participate in the decision of this case.

NIGRO, J., files a dissenting opinion.

## DISSENTING OPINION

NIGRO, Justice, dissenting.

In this action, both the Workers' Compensation Appeal Board and the Commonwealth Court affirmed the decision of the Workers' Compensation Judge. However, the majority concludes that claimant failed to prove her mental injury resulted from an abnormal working condition. In reaching its decision, the majority ignores the line of cases in the Commonwealth Court where benefits were awarded to claimants who encountered work events that triggered mental disability. Further, the majority disregards the findings of the Workers' Compensation Judge, the Workers' Compensation Appeal Board and Commonwealth Court. As such, I believe the majority is engaging in mere error review by reversing the Commonwealth Court's finding that claimant suffered a psychic injury as a result of abnormal working conditions. Accordingly, I must respectfully dissent.

In other cases, the Commonwealth Court has affirmed the award of benefits to claimants who pointed to actual work events which precipitated a mental disability. In *Bevilacqua v. Workmen's Compensation Appeal Board (J. Bevilacqua Sons, Inc.)*, 82 Pa.Cmwlth. 511, 475 A.2d 959 (1984), a worker who had encountered increased responsibility on a new job and mental disability resulted received benefits. In *Allegheny Ludlum Steel Corporation v. Workmen's Compensation Appeal Board (Fisher)*, 91 Pa.Cmwlth. 480, 498 A.2d 3 (1985),

increased job responsibility due to loss of an assistant and an accumulation of work were deemed sufficient to award benefits. Further, mental injuries resulting from stressful conditions which included public reprimands by supervisors were found to be compensable. *Bell Telephone Company of Pa. v. Workmen's Compensation Appeal Board (DeMay)*, 87 Pa. Cmwlth. 558, 487 A.2d 1053 (1985); *McDonough v. Workmen's Compensation Appeal Board (Com. of Pa., Dept. of Transp.)*, 80 Pa.Cmwlth. 1, 470 A.2d 1099 (1984).

It is well-settled that when reviewing workers' compensation cases the appellate court's role is not to reweigh evidence or review credibility of witnesses; rather, the reviewing court should determine whether, upon consideration of the evidence as a whole, the referee's findings are supported by substantial competent evidence. *Bethenergy Mines, Inc. v. W.C.A.B. (Skirpan)*, 531 Pa. 287, 612 A.2d 434 (1992). Further, the referee has the power as the factfinder to determine credibility and to accept or reject the testimony of any witness. *Harman Coal Company v. Dunmyre*, 474 Pa. 610, 613, 379 A.2d 533, 534 (1977). The referee is the judge of credibility and it is within the referee's province to accept or reject the testimony of any witness, including a medical witness. *Gateway Coal Company v. W.C.A.B. (Laboda)*, 138 Pa.Cmwlth. 332, 588 A.2d 73, *allocatur denied*, 528 Pa. 633, 598 A.2d 286 (1991).

Here, the Workers' Compensation Judge found that the testimony of claimant's co-worker and her division manager to be credible, as their testimony supported claimant's assertions regarding changes and increases in her workload. Additionally, the Workers' Compensation Judge explicitly noted as credible the testimony of Dr. Slayton, claimant's treating psychiatrist. Dr. Slayton testified that increases in claimant's work duties, responsibilities and hours worked as a result of the inter-regional merger resulted in an abnormally excessive workload for claimant. Accordingly, the Judge concluded that:

> Claimant sustained her burden of proof that she became disabled on June 6, 1988 due to depression caused by a

change in her working conditions. (Conclusion of Law No. 1)

Despite that specific conclusion, the majority, as a matter of law, determines that appellee's mental injury was not work-related.

Thus, I dissent, and would affirm the order of the Commonwealth Court awarding benefits to the appellee.