CITY OF PITTSBURGH, Petitioner,

v.

WORKERS' COMPENSATION AP-
PEAL BOARD (PLOWDEN),
Respondent.

Commonwealth Court of Pennsylvania.

Argued May 7, 2001.

Decided May 6, 2002.

Reargument/Reconsideration
Denied July 3, 2002.

Publication Ordered Aug. 1, 2002.

Brian D. Walters, Pittsburgh, for peti-
tioner.

Sara J. Klein, Pittsburgh, for respon-
dent.

Before DOYLE, Senior Judge,[1]
KELLEY, Senior Judge, and
FLAHERTY, Senior Judge.

### ORDER

OPINION BY Senior Judge DOYLE.

AND NOW, this *1st* day of *August,* 2002, it is ORDERED that the above-captioned opinion filed May 6, 2002, shall be designated OPINION rather than MEMORANDUM OPINION, and it shall be reported.

The City of Pittsburgh petitions this Court for review of an order of the Workers' Compensation Appeal Board (Board) that affirmed an order of a Workers' Compensation Judge (WCJ) granting Lionel Plowden's claim petition for a "mental/mental" injury. After careful review of the record, we reverse the order of the Board.

On July 7, 1997, Plowden initiated this action by filing a claim petition with the Bureau of Workers' Compensation, in which he alleged that he sustained a mental injury in the course of his employment with the City as a Clerk II when he was required to interact with gang members and received threatening phone calls. In response, the City filed an answer denying Plowden's material allegations. The case was assigned to a WCJ and hearings were held.

In support of his petition, Plowden testified on his own behalf and also offered, *inter alia,* the testimony of Commander Gwendolyn J. Elliott of the Pittsburgh Police Department and Anna McCafferty, as-

sistant director of personnel for the City and Plowden's former supervisor. The substance of the testimony of these three individuals is as follows.

Beginning in August of 1993, Plowden was employed by the City in the job category of Clerk II.[2] In October 1993, Plowden began serving in the intake office of the personnel department. Plowden's initial primary duty with the personnel department was assisting community members with their enlistment in the Job Training Partnership Act (JTPA) program, a program designed to aid disadvantaged members of the community in obtaining employment. Plowden's duties with regard to the JTPA involved filing records, assisting with the payroll system, providing customer service, and administering employment tests to applicants; he would also often answer questions regarding the program over the phone or in person at the intake office.

In August of 1994, Plowden was assigned to work as part of the Mayor's Task Force on Youth Violence (Task Force). The Task Force was designed to address youth violence and gang activity in the City. The program specifically targeted the "hundred baddest kids" and offered them varied services, including assistance with obtaining employment. The role of the personnel department was to ensure that these youth were eligible to work. Plowden's responsibilities under this new assignment involved assisting program

---

1. This case was assigned to the opinion writer prior to the date when President Judge Doyle and Judge Kelley assumed the status of senior judge on January 1, 2002.

2. Prior to accepting his position as a Clerk II, Plowden worked for the City as a monitor in a summer youth program. Plowden claimed that, in that position, he never actually worked with any gang members but only

worked with youth who were "copycats," *i.e.,* they simply dressed like gang members to avoid being harassed. Also, prior to his employment with the City, Plowden served in the United States Army from 1981 to 1988. After leaving the Army, Plowden relocated to Pittsburgh and applied for a position as a police officer with the City.

members with obtaining proper documentation required for employment.

On two occasions, as part of his new duties, Plowden was required to transport several of the youths to obtain employment documents. On the second of such trips, one of the youths bragged to Plowden about his criminal background and activities, but never threatened him in any way. It was at that point, Plowden claims, that he actually realized the gang members' propensity towards crime and violence. Following this realization, Plowden alleged that several incidents occurred that made him feel that his life was in danger.

Specifically, Plowden indicated that, one evening, while he was waiting at a bus stop after work, a car full of unknown youths, one of whom appeared to have a gun, drove by the bus stop, slowed, shouted Plowden's name and, then, stating "that's not him," drove off. On another occasion, Plowden indicated that he felt that two unknown individuals were following him after work; he and his brother followed the individuals back to the North Side of the City but became fearful and discontinued their pursuit. Finally, Plowden indicated that he received several phone calls between September 17th & 19th, 1994, during which an unidentified individual threatened him for not informing the gang members that they would be required to undergo urinalysis testing as part of the program.

Following the last phone call on September 19th Plowden reported the incidents to the head of the Task Force, Commander Elliott. At that meeting, Plowden was very distraught and began crying. The following day, he checked himself into a Veterans Administration Hospital. Plowden was released after approximately eight weeks but remained under the care of a psychiatrist.

On December 23, 1999, after finding the testimony of Plowden, Commander Elliott, and Ms. McCafferty to be credible, the WCJ issued a decision in which he granted Plowden's claim petition. The WCJ determined that, as of September 20, 1994, Plowden had become totally disabled due to a mental injury in the nature of severe depression, anxiety, and paranoia, which resulted from abnormal working conditions in his employment with the City. The City appealed to the Board and the Board affirmed the decision of the WCJ. The City now petitions this Court for review of the Board's order.

Specifically, the City raises the following issues for our review: 1) whether the Board erred in affirming the decision of the WCJ when Plowden failed to establish he was working under abnormal working conditions; 2) whether the Board erred in affirming the decision of the WCJ when the evidence of record did not support the WCJ's findings of fact; and 3) whether the Board erred in affirming the decision of the WCJ when Plowden failed to present unequivocal medical testimony establishing a psychiatric injury.[3]

Addressing the first issue raised, we note that the burden is on a workers' compensation claimant to establish a right to compensation through the proof of all necessary elements. *Halaski v. Hilton Hotel,* 487 Pa. 313, 409 A.2d 367 (1979); *Fox v. Workmen's Compensation Appeal Board (Eazor Express, Inc.),* 30 Pa. Cmwlth. 93, 373 A.2d 141 (1977). In order to establish a right to compensation in

---

3. In a workers' compensation case, our review is limited to a determination of whether constitutional rights were violated, an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. *Morey v. Workmen's Compensation Appeal Board (Bethenergy Mines, Inc.),* 684 A.2d 673 (Pa.Cmwlth.1996).

cases wherein it is claimed that a psychological stimulus caused a psychological injury (mental/mental), a claimant must prove by objective evidence that he has suffered a psychological injury, in the course of his employment, and that such injury is not a subjective reaction to normal working conditions for that kind of job. *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990); *Antus v. Workmen's Compensation Appeal Board (Sawhill Tubular Division, Cyclops Industries, Inc.)*, 155 Pa.Cmwlth. 576, 625 A.2d 760 (1993), *aff'd*, 536 Pa. 267, 639 A.2d 20 (1994); *Sibrava v. Workmen's Compensation Appeal Board (Trans World Airlines)*, 113 Pa.Cmwlth. 286, 537 A.2d 75 (1988). Thus, in addition to proving that an injury was suffered in the course of his employment, a claimant seeking compensation for a mental/mental injury bears a heavy burden of establishing that the injury was the result of an objective reaction to abnormal working conditions, *viz.*, that either actual extraordinary events occurred at work, which can be pinpointed in time, or that prolonged abnormal conditions existed. *See U.S. Airways v. Workers' Compensation Appeal Board (Long)*, 756 A.2d 96 (Pa.Cmwlth.2000), *petition for allowance of appeal denied*, 565 Pa. 659, 771 A.2d 1293 (2001). In addition, although we are mindful that questions of credibility and weight to be afforded the evidence are within the sole province of the WCJ, *Kraemer v. Workmen's Compensation Appeal Board (Perkiomen Valley School District)*, 82 Pa.Cmwlth. 469, 474 A.2d 1236 (1984), whether the facts found by a WCJ support a conclusion that a claimant was exposed to abnormal working conditions is a question of law that is fully reviewable on appeal. *Wilson v. Workmen's Compensation Appeal Board (Aluminum Company of America)*, 542 Pa. 614, 669 A.2d 338 (1996); *US Airways*.

■ In the case *sub judice*, with regard to the issue of abnormal working conditions, the WCJ found the following:

First and foremost, this judge finds that the claimant testified persuasively and credibly that he was subjected to working with some of the City's most dangerous and violent youth. This in itself is enough to warrant the label of an "abnormal working condition" for a civilian employee which the claimant was.... This judge accepts as credible that once the claimant became aware of the violent and criminal backgrounds of the youth he worked with, he became concerned with his own welfare. This information, alone, or combined with the threatening phone calls and being followed, would be enough to cause any normal human being to become paranoid and "fearful" for his life. To have to work in an atmosphere where one is fearful for one's life, cannot be a normal working condition, especially when one's normal original job was to perform clerical duties.

(WCJ's Op., Findings of Fact Nos. 10 & 11 at 13). The WCJ states that the mere fact that Plowden was eventually assigned to work with the Task Force, *i.e.*, working with potentially violent youth, supports a conclusion that Plowden experienced abnormal working conditions. Our Supreme Court has held, however, that "[c]hanged working conditions are not synonymous with 'abnormal working conditions'" and new duties and increased workload are not enough to be considered "abnormal working conditions." *Hershey Chocolate Co. v. Workmen's Compensation Appeal Board (Lasher)*, 546 Pa. 27, 42, 682 A.2d 1257, 1264 (1996). Furthermore, it is well established that psychological injury cases are highly fact-sensitive and for work conditions to be considered abnormal they must be considered in the context of the **specific** employment. *Wilson; Martin; Blecker v.*

*Workmen's Compensation Appeal Board (Pennsylvania Human Relations Commission)*, 141 Pa.Cmwlth. 317, 595 A.2d 729 (1991), *aff'd*, 546 Pa. 83, 683 A.2d 262 (1996). Thus, Plowden's work conditions as a Clerk II must be evaluated in the context of his specific employment, which was a Clerk II assigned to work with the Task Force, assisting potentially violent youth in obtaining employment; the mere fact that Plowden may have experienced increased stress or potential danger as part of his new duties is *not* sufficient to support a finding of abnormal working conditions. Only a showing of some extraordinary event or prolonged abnormal conditions in the context of his duties with the Task Force can support a finding of abnormal working conditions.

In this respect, Plowden presented testimony regarding (a) an incident at a bus stop, (b) an occasion where he was allegedly followed, and (c) incidents of threatening phone calls. Only the latter, however, appears to be obviously related to Plowden's employment. For example, with regard to the bus stop and following incidents, Plowden testified as follows:

> Q. You talked about the first instance being at a bus stop in front of the City–County Building?
>
> A. Yes, on the side of the City–County Building.
>
> . . . .
>
> Q. You had also advised them, you had said that one of the men in the car said "That's not him" and drove off.
>
> A. Yes.
>
> Q. So no one actually yelled out "Mr. Plowden" or "Lionel"?
>
> A. Yes, the first name Lionel. When I looked, as far as I can recollect from what I saw, one of those youths belonged to the [Task Force].
>
> Q. So your testimony is now on cross-examination you could actually identify one of the youths as part of the [Task Force] program?
>
> A. **I can't actually identify him. I'm not sure, but in my heart on that particular date as far as I can recall, I kind of feel that it was. I could be wrong, but it looked like him.**
>
> . . . .
>
> Q. Did they all have guns?
>
> A. **No. As far as what I saw, it looked like a gun. I'm not even sure if what I saw was a gun or not.**
>
> . . . .
>
> Q. On direct examination, you then testified about a second incident in which you felt the two individuals were watching you.
>
> A. Yes.
>
> . . . .
>
> Q. You couldn't identify who the two youths were; correct?
>
> A. **No, I couldn't.**

(Notes of Testimony, N.T., Deposition of Lionel Plowden, November 17, 1998, at 79, 82–83, 85, 87) (emphasis added). Plowden could not identify any of the persons associated with either incident as being part of the Task Force youth, and there is no objective indication that these alleged incidents were indeed related to Plowden's position with the Task Force. Plowden's testimony merely recounts his subjective reaction to **perceived** threats that may or may not have been work-related. Again, the only incidents that clearly appear to be related to Plowden's position in the Task Force are the threatening phone calls he received while at work.

With regard to these calls, however, there is no indication that another individual with his job duties would not experience similar conditions or events. It is reasonable to say that any individual assigned to work with potentially violent

gang members may, as a ramification of dealing with such people, expect to encounter very stressful situations from time to time, which may very well include the receipt of a threatening phone call. Although unfortunate, such an occasion in the context of working with potentially violent youth could not be considered extraordinary, and therefore is not enough to constitute an abnormal working condition. Certainly, when Plowden accepted these job duties, working with the "Mayor's Task Force on **Youth Violence**," he should have realized that conflict, and perhaps even some slight element of danger or unrest, might be involved.

Therefore, as it was Plowden's burden to establish all of the elements necessary to support his claim, and he failed to demonstrate that his psychic injury resulted from abnormal working conditions, his claim petition should have been denied. Accordingly, the order of the Board is reversed.[4]

### ORDER

**NOW,** *May 6, 2002,* the order of the Workers' Compensation Appeal Board in the above-captioned matter is hereby reversed.

### DISSENTING OPINION BY SENIOR JUDGE FLAHERTY.

Lionel Plowden's working conditions were so abnormal that justice calls for the orders of the Workers' Compensation Judge (WCJ) and the Workers' Compensation Appeal Board (WCAB)(affirming the WCJ) to be affirmed by this Court. I do, therefore, respectfully dissent from the majority opinion.

This case does not involve a police officer or a firefighter who first undergoes rigorous mental and physical preparation and training at a professional academy before being assigned the hazardous duties to which they have eagerly volunteered to engage.

Here, we have the equivalent of an untrained, non-combatant personnel clerk, hired in the City's intake office to help disadvantaged people get into a job-training program that will, hopefully, provide them with employment. Lionel's duties for almost the entire first year of his employment consisted of filing records, payroll duties, customer service, administering tests, and answering questions.

Then, without any training, mental conditioning, lecturing, warnings, etc., Lionel is then plucked from the safety and security of the intake office and involuntarily selected for the apparently hurriedly created Mayor's Task Force on Youth Violence, which has the laudable objective of serving the "hundred baddest kids" in the City while given the responsibility of ensuring that these "kids" were eligible to work. Lionel's piece of that responsibility required him to go into their neighborhood, to transport these youths to obtain employment documents and, presumably, to transport them back into the "neighborhood."

The City provided Lionel with no preparation, physical or mental conditioning or training for this Task Force position into which he was thrust. The scenario is so ludicrous that it didn't even dawn on Lionel that he was transporting gang members until one of his passengers bragged to him about the extent of his criminal background.

During his first assigned month on the Mayor's Task Force on Youth violence,

---

4. Because our position regarding the first issue is dispositive, we need not address the City's remaining issues.

Lionel was intimidated by the appearance of a car full of youths while he was waiting for a bus.

Another time, Lionel felt two unknown individuals who were following him after work. He then received threatening phone calls for not telling gang members that he was transporting them to tests where they would have to undergo urinalysis, causing Lionel to reasonably fear that he would be unjustifiably harmed by the misapprehensions of gang members suspecting him to be luring them into a law enforcement sting operation.

The majority feels that merely increasing stress or creating potential danger like this on a new job is not sufficient to support a finding of abnormal working conditions. I would agree if he had been properly trained, conditioned and possibly, educated, armed or protected before being sent into the field, but not when he was needlessly exposed to such dangers while being sent into the gangland workplace in a totally defenseless condition. The whole scenario could be scripted for a Hollywood comedy if the consequences were not so tragic. The proof of the abnormality is that after a perfectly normal one-year performance as an intake clerk, Lionel has a complete mental breakdown after only one month as an untrained, unprepared member of the Task Force.

I agree with the WCJ:

First and foremost, [the] judge finds that the claimant testified persuasively and credibly that he was subjected to working with some of the City's most dangerous and violent youth. This in itself is enough to warrant the label of an "abnormal working condition" for a civilian employee, which the claimant was . . .

[The] judge accepts as credible that once the claimant became aware of the violent and criminal backgrounds of the youth he worked with, he became concerned with his own welfare. This information, alone or combined with the threatening phone calls and being followed, would be enough to cause any normal human being to become paranoid and "fearful" for his life. To have to work in an atmosphere where one is fearful for one's life cannot be a normal working condition, especially when one's normal original job was to perform clerical duties.

(WCJ's Op., Findings of Fact Nos. 10 & 11 at 13).

The majority reasoning is skewed:

Furthermore, it is well established that psychological injury cases are highly fact-sensitive and for work conditions to be considered abnormal, they must be considered in the context of the **specific** employment. [Citations omitted]. Thus, Plowden's work conditions as a Clerk II must be evaluated in the context of his specific employment, which was a Clerk II assigned to work with the Task Force, assisting potentially violent youth in obtaining employment . . .

Majority Opinion, p. 7.

It is evident that the reasoning of the majority begins logically when on one hand, it acknowledges that Lionel was **merely a Clerk II** clerical worker and then becomes skewed as it nonchalantly includes the abnormal expectation of Lionel, "being assigned to work with the Task Force, assisting potentially violent youth in obtaining employment . . ." as just another run-of-the-mill duty assigned to clerical workers in the course of their personnel employment. Without background for or training in this position, to have an expectation that a mere clerk would be expected to catapult himself into the highly dangerous nature of the work is ludicrous on its face. And, in fact, the WCJ made credibil-

ity findings supporting such a conclusion that Lionel's working conditions were abnormal. The Board agreed.

For this court to now reweigh the credibility findings of the WCJ and WCAB to find that such an outrageous condition was *not* abnormal, seems abnormal.

I go beyond the WCJ and the Board and declare that the lack of pre-conditioning, orientation, basic training, and the complete lack of safety procedures to protect this clerical worker are prima facie abnormal working conditions in this specific employment situation.

The WCJ and the Board should be affirmed.