625 A.2d 760

**Tyrone M. ANTUS, Petitioner,**

v.

**WORKMEN'S COMPENSATION APPEAL BOARD (SAWHILL TUBULAR DIVISION, CYCLOPS INDUSTRIES, INC.), Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 22, 1992.

Decided May 18, 1993.

Petition for Allowance of Appeal Granted Sept. 21, 1993.

578

Robert L. Lackey, for petitioner.

Dennis W. Glass, for respondent.

Before PELLEGRINI and FRIEDMAN, JJ., and NARICK, Senior Judge.

FRIEDMAN, Judge.

Tyrone M. Antus appeals from an order of the Workmen's Compensation Appeal Board (WCAB) affirming a referee's decision awarding Antus compensation for the period from May 14, 1987 through May 31, 1987, denying Antus compensation for an alleged psychiatric work-related injury, and granting Sawhill Tubular Division, Cyclops Industries, Inc. (Cyclops) a termination, effective June 1, 1987. We affirm.

In 1966, Antus began working for Cyclops in its fabrication plant and remained employed there until he was laid-off in March 1982. Cyclops recalled Antus to work in its pipe plant in November 1986, initially assigning Antus to work in the labor gang, where he performed general clean-up duties and served as a replacement for employees temporarily absent from their job. Subsequently, Antus became a pipe sorter and, in January 1987, was injured while working at this position; he was reassigned to the labor gang after his return to work.

On May 4, 1987, Antus was assigned the job of utility stockman.[1] This position required Antus to operate a remote-

1. Antus was assigned to this position through routine company procedure, as controlled by the seniority provisions of the union contract. First, the utility stockman job was put up for bid; however, because it was a demanding position which offered no opportunity for incentive pay, none of the employees signed up for it. Under these circumstances, the unbid job is automatically assigned to the member of the labor gang with the lowest seniority; as such, it fell to Antus.

controlled overhead crane, something he had never attempted previously. Antus received approximately one week of training before assuming operation of the crane on his own.[2] This work was considerably more demanding than his prior jobs with Cyclops, and Antus had difficulty keeping up with the pace set by the plant departments he was to service. Moreover, during the week of May 11–14, 1987, the conditions on the pipe plant floor included high temperatures and noxious fumes. As a result, on May 14, 1987, Antus collapsed at work after experiencing shortness of breath, loss of orientation, profuse sweating, chest pain and nausea. He was taken by ambulance to the hospital where his treating physician, Dr.

2. The length of Antus' training period is a matter of dispute between the parties. Antus argues that he actually received only one day of training on May 11, 1987. Antus testified that he spent the first 4 hours observing, while his trainer, Mr. Robert Rice, operated the crane and instructed Antus in its use; then, during the second 4 hours, Antus ran the crane under Mr. Rice's supervision. Antus stated that when he reported to work on May 12, 1987, he was totally on his own. (N.T. at 19–20, 23, Hearing of May 3, 1989.)

On the other hand, while conceding that Antus operated the crane by himself during the week of May 11, 1987, Cyclops presents evidence that Antus began his period of training on May 4, 1987. This claim was supported by the testimony of Rice who, although unable to recall exactly which dates he spent training Antus, stated that he often prepared people for this job and never trained inexperienced crane operators for less than a week. (N.T. at 21, 27–28, Hearing of March 14, 1990.) In addition, Mr. Harvey Tennant, superintendent of the pipe plant, testified that the company's payment records indicated that Rice had trained Antus during the week of May 4, 1987. (N.T. at 49–52, Hearing of March 14, 1990.)

As to this matter, the referee found:
   9. On May 4, 1987, the claimant was assigned the job of Utility Stockman. The Utility Stockman is required to operate a remote-controlled overhead crane. When the claimant reported for duty on May 11, 1987, he went approximately one week of training with fellow employee, Robert Rice.
(Referee's Finding of Fact No. 9.)

Although this finding does not distinctly identify the dates devoted to Antus' training, it does explicitly indicate that Antus received a week of training. Because the record contains substantial evidence to support that finding, we must accept it. *Bell Telephone Co. v. Workmen's Compensation Appeal Board (Rothenbach)*, 98 Pa.Commonwealth Ct. 332, 511 A.2d 261 (1986). However, Antus contends that even a full week of training was insufficient. We discuss this contention more fully later in our opinion, in the context of abnormal work conditions.

Gregory A. George, diagnosed Antus as suffering from heat exhaustion and determined that the condition would keep him out of work through May 31, 1987. Dr. George also noted that Antus was suffering from a reactive depression with stress.

Antus never returned to work and on March 9, 1989, filed a claim petition against Cyclops alleging that he was disabled as a result of his May 14, 1987 work injury; specifically from heat exhaustion, stress, work anxiety, depression and dysthymia. Cyclops denied the allegation.

Over the course of several hearings before the referee, both parties presented evidence. Antus testified on his own behalf and offered evidence from several other lay witnesses regarding plant conditions. In addition, Antus presented the deposition testimony of his treating psychiatrist, Dr. Robert J. Algaier, who testified that Antus still suffered from dysthymia or major depression caused by his subjective perception of and response to environmental stressors at work during the week of May 11–14, 1987. Cyclops presented evidence from various Cyclops' employees and offered the deposition testimony of psychiatrist, Dr. Stuart S. Burstein. Dr. Burstein stated that Antus' perception of his work environment was not consistent with reality, but viewed in harsher tones than the situation justified. Further, Dr. Burstein testified that Antus could have returned to work after May 31, 1987.

The referee favored Dr. Algaier's testimony regarding Antus' current psychiatric condition and credited the reports of Dr. George relating to Antus' period of disability from heat exhaustion. The referee concluded that Antus was entitled to compensation for heat exhaustion from May 14, 1987 through May 31, 1987. However, based on the testimony of Cyclops' employees, the referee determined that Antus' work environment was not abnormal with respect to the position of utility stockman. The referee found that even those experienced at the job had difficulties adjusting and keeping up the pace at the pipe plant. In addition, the referee found that although Antus may have feared he would injure himself or others by improperly operating the crane, Antus actually performed the job adequately during the week of May 11, 1987. Therefore,

the referee terminated benefits as of June 1, 1987, concluding that Antus' work-related psychiatric disability was not compensable because it arose from his subjective reaction to normal working conditions. The WCAB affirmed.

On appeal,[3] Antus argues that the referee and WCAB erred in determining that Antus had not proven a compensable psychiatric injury. Specifically, Antus contends that his disabling psychiatric problems were caused by his reaction to abnormal working conditions and that the referee's conclusion to the contrary was not supported by substantial evidence in the record. Alternatively, Antus argues that even if the referee concluded correctly that Antus' psychiatric problems arose from his subjective reaction to normal working conditions, the referee's order should be modified to direct Cyclops to pay benefits to Antus from May 14, 1987 until May 23, 1991, the date on which the referee reached that determination. Finally, Antus contends that requiring him to prove abnormal working conditions in order to receive benefits for psychiatric injury violates his constitutional rights of due process and equal protection under the law.

Psychiatric disability caused by work-related stress may be compensable under section 301(c) of The Pennsylvania Workmen's Compensation Act;[4] however the degree of proof required in such cases is quite high. *Hammerle v. Workmen's Compensation Appeal Board (Department of Agriculture)*, 88 Pa.Commonwealth Ct. 486, 490 A.2d 494 (1985). "Due to the highly subjective nature of psychiatric injuries, the occurrence of the injury and its cause must be adequately pinpointed." *Thomas v. Workmen's Compensation Appeal Board (Atlantic Refining Co.)*, 55 Pa.Commonwealth Ct. 449, 455, 423 A.2d 784, 787 (1980). Where, as here, there is no obvious causal connection between the claimant's work and injury, the rela-

3. Our scope of review is limited to determining violations of constitutional rights, errors of law, violations of agency practice and procedure and whether findings of fact are unsupported by substantial evidence. 2 Pa.C.S. § 704; *Reigle v. Workmen's Compensation Appeal Board (Federal Express)*, 144 Pa.Commonwealth Ct. 583, 601 A.2d 1331 (1992).

4. Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 411(1).

tionship must be established by unequivocal medical testimony. *Kitchen v. Workmen's Compensation Appeal Board (Mesta Machine Co.)*, 73 Pa.Commonwealth Ct. 289, 458 A.2d 631 (1983). A claimant's subjective reaction to being at work and being exposed to normal working conditions is not a compensable injury under the Act. *Moonblatt v. Workmen's Compensation Appeal Board (City of Philadelphia)*, 85 Pa.Commonwealth Ct. 128, 481 A.2d 374 (1984); *Thomas*. What constitutes normal working conditions should be viewed in the context of the work involved.[5] *Lukens Steel Co. v. Workmen's Compensation Appeal Board (Price)*, 149 Pa.Commonwealth Ct. 177, 612 A.2d 638 (1992); *City of Scranton v. Workmen's Compensation Appeal Board (Hart)*, 136 Pa.Commonwealth Ct. 483, 583 A.2d 852 (1990), *appeal denied*, 528 Pa. 625, 597 A.2d 1154 (1991). In sum, then, compensability for psychiatric injuries which are unaccompanied by physical trauma[6] requires a claimant to prove that (1) he suffered a

5. For a high stress working environment to constitute a legally sufficient abnormal working condition, the claimant's work performance, as opposed to his job description, must be unusually stressful for that kind of job, or an unusual event must have occurred to make it more stressful than it had been. *Squilla v. Workmen's Compensation Appeal Board (Marple Township)*, 146 Pa.Commonwealth Ct. 23, 606 A.2d 539 (1992), citing *City of Scranton v. Workmen's Compensation Appeal Board (Hart)*, 136 Pa.Commonwealth Ct. 483, 583 A.2d 852 (1990).

6. An employee claiming psychiatric disability due to work-related stress has a greater burden of proof than the employee claiming benefits based on related physical and mental injury. Antus contends that because his mental disorder was accompanied by a related physical injury, the heat exhaustion that caused his collapse, that this is not a purely psychiatric injury case requiring the heightened burden of proof endorsed by the Pennsylvania Supreme Court in *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990). We disagree.

A review of claims involving psychological elements indicates that the cases fall into three discrete categories. In two of these categories, the physical injury directly leads to the mental injury or vice versa, the so called physical/mental and mental/physical cases. In the third category, the mental/mental case, the mental injury is caused solely by psychological
factors.

Here, there is absolutely no evidence that the heat-exhaustion brought about or even contributed to Antus' psychiatric disability; in fact, Antus himself never makes this assertion. Instead, he continually claims that his depression directly resulted from the pressures he experienced in his new position as utility stockman; therefore, this is a mental/mental

psychiatric injury (2) which was causally related to his employment (3) and was more than a mere subjective reaction to normal working conditions (4) for that kind of job. We now apply these principles to the present case.

Based upon the evidence presented, particularly the unequivocal testimony of Dr. Algaier, the referee found that Antus suffers from a mental disorder as a result of environmental stressors at his place of employment during the week of May 11, 1987. There is sufficient evidence in the record to support this finding, and we will not disturb it on appeal. Therefore, Antus has satisfied the first two requirements. However, because even mental and nervous disabilities causally related to a claimant's employment are not compensable if due to an employee's subjective reaction to normal working conditions, *Lukens Steel; Waldo v. Workmen's Compensation Appeal Board (Erie Metropolitan Transit Authority)*, 136 Pa.Commonwealth Ct. 264, 582 A.2d 1147 (1990), we must continue our analysis. Working conditions may cause the injury, but the claimant bears the burden of showing that these working conditions were abnormal. Whether a claimant was subjected to abnormal working conditions is a mixed question of law and fact, fully reviewable by this court. *Marsico v. Workmen's Compensation Appeal Board (Pennsylvania Department of Revenue)*, 138 Pa.Commonwealth Ct. 352, 588 A.2d 984 (1991).

Antus alleges that this is not a case where the referee determined that the claimant had a distorted perception of his work conditions. *See Hirschberg v. Workmen's Compensation Appeal Board (Department of Transportation)*, 81 Pa.Commonwealth Ct. 579, 474 A.2d 82 (1984). Rather, Antus contends that it is undisputed that he experienced a change of duties, coupled with increased responsibility and a dramatically harsher and more dangerous work environment than that to which he was accustomed. Relying on *Leo v. Workmen's Compensation Appeal Board (Borough of Charleroi)*, 114

case to which we must apply the increased burden of proof as set forth in *Martin*.

Pa.Commonwealth Ct. 6, 537 A.2d 399 (1988) and *Bevilacqua v. Workmen's Compensation Appeal Board (J. Bevilacqua Sons, Inc.)*, 82 Pa.Commonwealth Ct. 511, 475 A.2d 959 (1984), cases decided previously by this court, Antus asserts that evidence of a significant change in job responsibilities coincident with the onset of psychiatric injury is sufficient to establish abnormal working conditions stemming from actual rather than perceived employment events.

Indeed, in both *Bevilacqua* and *Leo,* we held that the assumption of new and greater work responsibilities *can* constitute abnormal working conditions; however, in both cases we based this holding not only upon a change in responsibilities but on the principle that a *long-term process of mental or emotional deterioration* may be compensable. In *Bevilacqua,* the claimant worked for fifteen years as a sheet metal worker under under a foreman's direct supervision. *Five years* prior to his breakdown, he assumed a new post which required a complete change of duties, including the supervision of other employees. With the change in duties, he began to develop mental difficulties, his condition objectively deteriorating over time until he became totally disabled. Based on this *combination of circumstances,* we distinguished the case from *Thomas* and awarded benefits.

In *Leo,* the claimant had worked for six years in the Borough's street department when he was transferred to its police department, entailing a total change in responsibilities. Claimant worked as a police officer for *six years* until finally suffering a mental breakdown, from a biological illness diagnosed as paranoia schizophrenia,[7] triggered by the stress he experienced in his efforts to fulfill the duties of his post. Referring to the claimant's change of duties *and* his long-term deterioration, we reversed the WCAB and reinstated the referee's grant of benefits, determining that *Leo* was indistinguishable from our decision in *Bevilacqua.*

7. We made special note of the fact that Leo did not suffer from a psychic illness, as determined by the WCAB, but rather from a biological disease; however, this was not the basis for the award of benefits.

In fact, an argument similar to this was made in *Cadden v. Workmen's Compensation Appeal Board (City of Philadelphia)*, 135 Pa.Commonwealth Ct. 195, 579 A.2d 1378 (1990), *appeal denied*, 527 Pa. 652, 593 A.2d 424 (1991). In *Cadden*, a Philadelphia fireman was transferred to a position with that city's emergency technician program, a shift that involved a substantial change in duties. The claimant was unable to endure the conditions inherent in the emergency technician job and, as a result, suffered a psychic injury. We acknowledged our holding in *Bevilacqua*, that a change in work responsibilities may constitute abnormal working conditions, but stressed that:

this type of case is fact sensitive and generally requires a determination by the fact finder as to whether or not, under the particular facts of the case, an internal change in employment creates an abnormal working condition.

*Cadden*, 135 Pa.Commonwealth Ct. at 198–99, 579 A.2d at 1380. Continuing our analysis, we stated:

In considering this issue, we note that the Claimant joined the fire department in 1959, a time when the emergency technician position was nonexistent and, therefore, certainly not the norm. In 1976 when the emergency squad was instituted as a division of the Philadelphia Fire Department, *this duty became an assignment which any fireman might expect; and, therefore,* for those joining the fire fighters after 1976, emergency squad duty *would most likely be a normal working condition. Id.* at 199, 579 A.2d at 1380 (emphasis added).

This reasoning is particularly apt here where, as an employee working on Cyclops' labor gang, Antus was routinely assigned to new and different jobs, sometimes on a daily basis. Duties for those working on the labor gang were given out according to seniority; therefore, as the employee lowest in seniority, Antus might have expected to be assigned to any job that remained unfilled.

In addition, we note that Antus' particular responsibilities as a utility stockman were derived from a collective bargaining

agreement. In *Andracki v. Workmen's Compensation Appeal Board (Allied Eastern States Maintenance)*, 96 Pa.Commonwealth Ct. 613, 508 A.2d 624 (1986), we stated that application of seniority provisions of a union contract requiring an employee to shift to night employment was a normal working condition because such changes necessitated by union contracts are common in the workplace. Although in *Andracki*, application of seniority provisions only effected a change in the claimant's working hours and did not alter his duties, the *Andracki* rationale still can be applied here.

Moreover, in *Pate v. Workmen's Compensation Appeal Board (Boeing Vertol Co.)*, 104 Pa.Commonwealth Ct. 481, 522 A.2d 166 (1987), *appeal denied*, 517 Pa. 611, 536 A.2d 1335 (1987), *cert. denied*, 484 U.S. 1064, 108 S.Ct. 1025, 98 L.Ed.2d 989 (1988), we held that even if a claimant adequately identifies actual (not merely perceived or imagined) employment events which have precipitated psychiatric injury, the claimant must still prove the events to be abnormal before he can recover. See also *Berardelli v. Workmen's Compensation Appeal Board (Bureau of Personnel State Workmen's Insurance Fund)*, 134 Pa.Commonwealth Ct. 450, 578 A.2d 1016 (1990), *appeal denied*, 527 Pa. 625, 592 A.2d 46 (1991). In *Pate*, we agreed that the claimant had identified work events triggering her psychiatric injury but concluded that such events "were not so abnormal or unusual in relation to those of her fellow workers so as to impose workmen's compensation liability upon her employer." *Id.* at 485, 522 A.2d at 168. Although we recognized the difficult nature of her task, we affirmed the denial of benefits, determining that Pate's working conditions were typical for her type of employment and did not differ from those of her fellow employees.

Here too, we acknowledge that the job of utility stockman was neither easy nor pleasant. However, the record indicates that the conditions in the pipe plant were not in any sense abnormal during the week of May 11, 1987, and that Antus' job responsibilities were no different from those of other utility stockmen. Co-workers testified that employees coming to the pipe plant from other places normally encountered

problems and had to go through a period of adjustment. In fact, the referee seemed to acknowledge these difficulties when he found that even experienced utility stockmen have trouble keeping pace with the work load. (Referee's Finding of Fact No. 19.) In short, Antus was faced with the same job difficulties as any other employee assuming this position. Indeed, his own psychiatrist referred to Antus' depression as resulting from his subjective reaction to his work environment. Under this set of circumstances, we must agree that Antus' assignment to the utility stockman position, despite its inherent difficulties, did not subject him to abnormal working conditions for that kind of job.

Beyond his general assertion that the unfamiliar, "harsh" job conditions associated with the position of utility stockman were abnormal, Antus also alleges that he received only one day of job training, that he was forced to use a defective crane on May 14, 1987, and that he was subjected to verbal abuse and conflicting demands by his foremen. However, these claims are supported only by Antus' own version of these events; in fact, testimony to the contrary was offered to and credited by the referee, indicating that Antus' perception of job conditions and working relationships were inconsistent with objective reality.[8] In workmen's compensation cases, questions of credibility and the choice between conflicting

8. In *Supinski v. Workmen's Compensation Appeal Board (School District of Philadelphia)*, 133 Pa.Commonwealth Ct. 631, 577 A.2d 944 (1990), we held that a claimant cannot rely solely on his own account of the working environment to meet the burden of showing that a psychiatric injury was not caused by a subjective reaction to normal working conditions; rather, a claimant's testimony of abnormal working conditions required corroboration. *Russella v. Workmen's Compensation Appeal Board (National Foam Systems, Inc.)*, 91 Pa.Commonwealth Ct. 471, 497 A.2d 290 (1985), *appeal denied*, 516 Pa. 637, 533 A.2d 95 (1987). In *Archer v. Workmen's Compensation Appeal Board (General Motors)*, 138 Pa.Commonwealth Ct. 309, 587 A.2d 901 (1991), we relaxed this standard and did not require such corroboration where the claimant's testimony was not limited to her *belief* of abnormal conditions but included testimony, *found credible by the referee*, regarding actual abnormal events. Thus, although Antus testified to various particular work events and conditions, only some of which were corroborated, the referee, as factfinder, remained free either to disbelieve the testimony, or, if accepted, conclude that the conditions perceived by Antus as abnormal were, in fact, normal working conditions for the job.

testimony are exclusively for the referee. *Hirschberg,* If the testimony accepted constitutes such relevant evidence as a reasonable mind would accept as adequate to support the conclusion reached, those findings will not be disturbed on appeal. *American Refrigerator Equipment Co. v. Workmen's Compensation Appeal Board (John Jakel),* 31 Pa.Commonwealth Ct. 590, 377 A.2d 1007 (1977).

Antus also asserts that because he was improperly trained to assume responsibility of the crane, he feared that he was endangering himself and others by its operation. Antus argues that even a full week of training was insufficient preparation for the position of utility stockman, based upon language in the job description requiring "experience on this and related work of 3 to 6 months inclusive." (Referee's Exhibit # 1, stipulation.) We note that the record contains no evidence addressing the meaning of this phrase. Moreover, the testimony of the Cyclops' employees, whether testifying on behalf of Antus or the company, suggests that all employees newly-assigned to the utility stockman position received approximately one week of training before assuming operation of the crane. The record also reveals, and the referee found, that Antus' fears that he was not up to the task required of him, so that he might injure himself or others on the job, were unfounded. (Referee's Findings of Fact No. 20.) Antus' training period was commensurate with all other Cyclops' employees and, notwithstanding Antus' own evaluation, the record offers no evidence of particular problems during the training period or afterward; therefore, there was substantial evidence to support the referee's conclusion that Antus' training was not abnormal.

Antus bases his second argument on the referee's failure to conclude that Cyclops violated section 406.1 of the Act, 77 P.S. § 717.1, concerning the employer's duty to promptly investigate and commence payment of compensation due. Antus claims that although Cyclops had actual notice of Antus' injury from heat exhaustion, it did not give notice to the Department of Labor and Industry and did not file either notice of compensation payable or notice controverting Antus'

right to compensation. No worker's compensation benefits were paid. Because of this allegedly deliberate deviation from procedure, Antus argues that the burden of proof in this proceeding should have been reversed, with Cyclops now seeking to terminate Antus' compensation. Based on this premise, Antus reasons that even if we determined that Antus' psychiatric problems arose from his reaction to normal working conditions, Cyclops would have had to pay benefits to Antus until May 23, 1991, the date of the referee's termination order. Unfortunately, however, Antus raised the issue of the section 406.1 violation for the first time before the WCAB. Because appeals are reviewed on the basis of the record produced before the referee, and that record is devoid of evidence supporting Antus' allegation that a section 406.1 violation has occurred, Antus has now lost the opportunity to raise the contention belatedly. *DeMarco v. Laughlin Steel Corp.*, 513 Pa. 526, 522 A.2d 26 (1987).[9]

Finally, with regard to Antus' constitutional challenge to the different burden of proof imposed on psychiatric as opposed to physical injury cases, we note only that we have considered this question previously and have continually affirmed the constitutionality of the practice because of the subjective nature of such disabilities. We see no reason to deviate from our prior position already set forth fully and capably in *Reigle v. Workmen's Compensation Appeal Board (Federal Express)*, 144 Pa.Commonwealth Ct. 583, 601 A.2d 1331 (1992) and *Pate*.

After a thorough review of the record, we conclude that the referee's findings were supported by substantial evidence and accepting those findings, we agree with the WCAB that Antus failed to satisfy his burden of proving that his psychiatric disability was other than a subjective reaction to normal working conditions. Accordingly, we affirm.

9. Antus argues that he raised this issue in a timely fashion by submitting it to the referee in his proposed findings of fact and his brief in support of the claim petition, in which he referenced Cyclops' failure to file either notice of compensation payable or refusal to pay compensation. However, this submission occurred after the close of the hearings and was never made a part of the record.

## ORDER

AND NOW, this 18th day of May, 1993, the order of the Workmen's Compensation Appeal Board, dated February 14, 1992, is affirmed.