**PA LIQUOR CONTROL BOARD, Petitioner**

v.

**WORKERS' COMPENSATION APPEAL BOARD (KOCHANOWICZ), Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 8, 2014.

Decided Dec. 30, 2014.

Robert J. Baker, Harrisburg, for petitioner.

Alfred J. Carlson, III, Philadelphia, for respondent, Gregory Kochanowicz.

BEFORE: DAN PELLEGRINI, President Judge, and BERNARD L. McGINLEY, Judge, and BONNIE BRIGANCE LEADBETTER, Judge, and RENÉE COHN JUBELIRER, Judge, and P. KEVIN BROBSON, Judge, and PATRICIA A. McCULLOUGH, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge COHN JUBELIRER.

In this remanded matter, the PA Liquor Control Board (Employer) petitions for review of the Order of the Workers' Compensation Appeal Board (Board) that affirmed the Workers' Compensation Judge's (WCJ) Decision granting the claim petition (Petition) filed by Gregory Kochanowicz (Claimant). The WCJ awarded Claimant workers' compensation (WC) benefits for a work-related mental injury[1] pursuant to the Pennsylvania Workers' Compensation Act (Act).[2] Because we conclude that the WCJ's findings of fact are supported by substantial evidence and these findings support the WCJ's conclusion that the armed robbery that caused Claimant's mental injury was not a normal working condition, we affirm.

## I. Background and Procedural History

The facts in this matter are not in dispute. Claimant worked for Employer for over thirty years and, on April 28, 2008, was the general manager of Employer's retail liquor store in Morrisville, Pennsylvania, when an armed robbery occurred. (WCJ Decision, Findings of Fact (FOF) ¶¶ 1, 10.) As found by the WCJ:

[1] Our precedent refers to such injuries interchangeably as mental injuries, psychic injuries, psychological injuries, and psychiatric injuries.

[2] Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4, 2501–2708.

2. On April 28, 2008 Claimant was working the evening shift that required that he prepare the store for closing at about 9:15 p.m. At about 8:57 [p.m.] Claimant was in his office preparing and counting the money when a female employee called him from the floor and he saw a masked man approaching him with a drawn gun. Once inside the office, the gunman showed Claimant a second gun, and asked Claimant where the store's money was kept. Claimant was instructed, with the gun to his head, to remove the money from the safe and place it in a backpack. Claimant was ordered to open a lock box as well. The man instructed the female employee to open her register and not hit the alarm. After taking the money from the register, the man ordered the female employee to check to ensure no one was outside the front of the store. During all of the foregoing, the robber held the gun to the back of Claimant's head. At the direction of the gunman, Claimant opened the back emergency exit door, and the gunman checked for bystanders. Claimant was tied up to a chair, along with the coworker, with duct tape. When Claimant showed anxiety, the gunman prodded Claimant with the gun to his head, and asked Claimant whether or not he was impatient. After the gunman left, Claimant extricated himself from the duct tape and called the police and [Employer's] head auditor. He left a message with his direct supervisor. He told Charles Keller in HR that he needed to take some time off due to the robbery. Claimant had never been robbed at work during his entire 30 years of employment. [Employer] referred Claimant to a panel social worker. He saw his own personal physician the following day, and has been treating with a psychologist, Dr. Raditz, to whom he was referred by his attorney. Claimant has had no previous psychological treatment. (FOF ¶ 2.)

Claimant explained that, after the gunman tied him and his coworker to a chair, they were told they had to wait twenty minutes before calling anyone or going out the back door because the gunman might come back inside. (Hr'g Tr. at 10, R.R. at 35a.) Claimant indicated that he waited approximately five minutes before he freed himself and called the police. (Hr'g Tr. at 10, R.R. at 35a.) Claimant testified that, in his over thirty years working for Employer, a normal day never involved a masked gunman entering his store, sticking a gun to the back of his head, and tying him up with duct tape. (Hr'g Tr. at 45, R.R. at 70a.) Claimant stated that he thought about the robbery every day and that these thoughts disrupted his sleep, caused nightmares, anxiety, stress, and difficulty relating to his family. (Hr'g Tr. at 13–14, R.R. 38a–39a.) Claimant testified that he did not believe he had improved to the point that he could return to his previous position because he continued to fear for his life and feared that something like the robbery would happen again. (Hr'g Tr. at 15–16, R.R. at 40a–41a.)

Claimant presented the deposition testimony of his treating psychologist, Brian S. Raditz, Ed.D. Based on his May 6, 2008 examination and continued treatment of Claimant, Dr. Raditz opined that Claimant suffered from Post–Traumatic Stress Disorder (PTSD) and adjustment disorder with mixed anxiety and depressed mood as a result of the April 28, 2008 armed robbery and could not return to his pre-injury position. (FOF ¶¶ 3–4.) Employer offered the deposition testimony of Timothy Michals, M.D., a specialist in clinical and forensic psychiatry. (FOF ¶ 5.) Based on his August 20, 2008 examination of Claimant and a review of medical records and

various test results, Dr. Michals opined within a reasonable degree of psychiatric certainty that Claimant experienced PTSD as a direct result of the April 28, 2008 armed robbery, continued to have anxiety, and continued to need both talk and pharmaceutical therapy.[3] (FOF ¶¶ 6–7.)

Employer also presented the deposition testimony of Charles Keller, the coordinator of Employer's confidential State Employee Assistance Program (SEAP), which provides counseling to Employer's employees. (FOF ¶ 9.) With respect to this testimony, the WCJ found as follows:

9. .... Mr. Keller provided training to Claimant and other employees on workplace violence in September of 2001 and April of 2005. Claimant also received updated written communications on the topic, and a verbal update f[rom] the district manager in January 2008. Mr. Keller testified that employees are taught the fact that violent events including robberies occur in stores, and that all stores are at risk. There had been robberies in the area of Claimant's store. He was not aware of the specific details, and therefore did not track violence in the area of Claimant's store. He did not know that[,] in close proximity to the April 28, 2008 incident, there had been robberies at other public facilities in the Morrisville area, such a[s] a donut shop and hotel. Mr. Keller agreed that some liquor stores in the Commonwealth have hired security guards, but that Claimant's store was not provided with a security guard. Ninety-nine (99) robberies have occurred since 2002 in Philadelphia and its surrounding counties. Despite the occurrences of robberies, liquor store managers are not provided with self[-]protective equipment or gear.

(FOF ¶ 9.)

The WCJ made the following findings of fact and credibility determinations based on the evidence presented:

10. This [WCJ] has reviewed and considered the evidentiary record, and finds Claimant's testimony credible and persuasive. This determination is based upon this [WCJ]'s personal observation of Claimant's manner and demeanor during testimony, and the consistency of Claimant's testimony and medical evidence. Claimant is an employee of [Employer] for over 30 years, and was never involved in workplace violence at a facility at which he was responsible prior to April 28, 2008. Prior to April 28, 2008 Claimant never had a gun pointed to the back of his head by a masked robber seeking to direct and control Claimant's actions and behaviors for the purpose of robbing money from the store, and ensuring his own safe escape through the back emergency exit door. Claimant's testimony of the event and the medical testimony explaining Claimant's mental problems caused by it are entirely consistent, trustworthy and credible. Claimant and [Employer's] medical evidence is consistent with Claimant's allegation that [he] sustained a disabling mental injury directly related to the [workplace] incident of April 28, 2008.

11. This [WCJ] accepts the [Employer's] fact testimony only to the extent to which it is consistent with her findings in this case. To the extent to which [Employer's] evidence is not consistent

---

**3.** Dr. Michals indicated that Claimant could return in a "position that is less threatening to him" and that "reassignment to alternative work should be an option." (FOF ¶ 7.) However, the WCJ credited Dr. Raditz's testimony that Claimant continues to suffer a disabling mental injury as a result of the April 28, 2008 incident. (FOF ¶ 12.)

with Claimant's testimony, [Employer's] evidence is rejected.

. . . .

13. Th[is WCJ] finds that despite the incidents of robberies at [Employer's] state liquor stores, robbery at gunpoint is an abnormal working condition. This [WCJ] finds, despite the evidence that Claimant attended training on workplace violence that was provided by [Employer] in 2001 and 2005 and provided pamphlets and educational tools on the handling of a robbery—workplace violence, *which includes robberies and theft,* (D–8, p. 6–7) is an abnormal working condition. This [WCJ] finds the evidence relative to the training of employees in ways of behaving during a robbery that best ensures *safety* to the person to whom the gun is pointed, as well as fellow employees and customers (D–4, p. 1) competent, she does not find … it entirely relevant to defend the type of injury that Claimant sustained on April 28, 2008. The fact that [Employer] provides immediate debriefing (D–8) to its employees and refers employees to its SEAP program following a violent workplace event correlates more closely with Claimant's case-in-chief. The fact that [Employer] acknowledges that workplace violence occurs does not place workplace violence into the realm of a normal working condition, especially when it triggers the mental processes that both Dr. Raditz and Dr. Michals explain. Robbery by gunpoint to the back of the head is neither a normal societal occurrence, nor a normal working condition.

(FOF ¶¶ 10–11, 13 (emphasis in original).)

Based on the findings, the WCJ concluded that Claimant met his burden of proving "that he was subjected to abnormal working conditions on April 28, 2008, and that the workplace violence that occurred on April 28, 2008 caused a disabling work injury to occur." (WCJ Decision, Conclusions of Law (COL) ¶ 2.) Accordingly, the WCJ granted the Petition. The Board affirmed the WCJ's award of benefits, and Employer petitioned this Court for review.

This Court reversed the Board's Order, concluding that Claimant had not sustained his burden of showing that his mental injuries were the result of exposure to an abnormal working condition. *PA Liquor Control v. Workers' Compensation Appeal Board (Kochanowicz),* 29 A.3d 105, 110–11 (Pa.Cmwlth.2011) (*Kochanowicz I* ). In doing so, this Court noted that the WCJ found that Employer had provided Claimant with training on workplace violence, including some training and pamphlets specifically related to robberies and theft, which Claimant admitted to attending and receiving. *Id.* We further noted that the record contained evidence that there had been 99 robberies of Employer's area retail stores since 2002, including a robbery near Claimant's store within weeks of the April 28, 2008 armed robbery. *Id.* at 111. Accordingly, we concluded that Claimant could have anticipated being robbed at gunpoint at work and, therefore, the April 28, 2008 armed robbery of Claimant's store was a normal condition of his retail liquor store employment. *Id.*

Claimant appealed to the Supreme Court, which granted Claimant's appeal, vacated our Order, and remanded the matter back to this Court:

for reconsideration in light of *Payes v. Workers' Compensation Appeal Board ([PA] State Police)* [621 Pa. 564], 79 A.3d 543, 552 ( [Pa.] 2013) [ (*Payes II* ) ] (holding that, because [mental] injury cases are highly fact-sensitive, a reviewing court must give deference to the factfinding functions of the WCJ and limit review to determining whether the

WCJ's findings of fact are supported by the evidence).

*Kochanowicz v. Workers' Compensation Appeal Board (PA Liquor Control Board),* — Pa. ——, 85 A.3d 480 (2014) (Per Curiam Order) (*Kochanowicz II* ). We begin our discussion on remand with a review of the precedent for work-related mental injuries.

## II. Precedent

In 1972, the General Assembly amended the Act's definition of injury, "abolish[ing] the requirement of an injury to the physical structure of the body," and adding "a work-related mental illness ... [as] a compensable injury" to Section 301(c) of the Act, 77 P.S. § 411.[4] *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159, 164 (1990). Since that time, the courts have wrestled with distinguishing between mental injuries that result from an individual's "subjective reaction to being at work and being exposed to normal working conditions," which is not sufficient to establish a compensable injury under the Act, from those injuries which would be compensable. *Id.* at 164. In *Martin*, our Supreme Court adopted the following analysis for determining whether a mental injury is compensable under the Act:

A claimant must produce objective evidence which is corroborative of his subjective description of the working conditions alleged to have caused the psychiatric injury. Because psychiatric injuries are by nature subjective, we believe that if a claimant has met his burden of proving the existence of a psychiatric injury, he cannot rely solely upon his own account of working environment to sustain his burden of proving that the injury was not caused by a subjective reaction to normal working conditions. A claimant's burden of proof to recover [WC] benefits for a psychiatric injury is therefore twofold; he must prove by objective evidence that he has suffered a psychiatric injury and he must prove that such injury is other than a subjective reaction to normal working conditions.

*Id.* at 164–65 (quoting *Russella v. Workmen's Compensation Appeal Board (National Foam Systems, Inc.)*, 91 Pa. Cmwlth. 471, 497 A.2d 290, 292 (1985)). The Supreme Court held that this standard helps to establish the causal link between the mental injury and the claimant's work, which is "the fundamental principal underlying the scheme of the [Act]—that, in order to be compensable, an injury must be work-related." *Martin,* 568 A.2d at 165. The Supreme Court cautioned that, *without this standard,* a claimant could seek WC benefits based only on the fact that the claimant "suffered from a mental illness while employed and that the illness was a condition created or aggravated by that [claimant's] perception of the conditions of his employment." *Id.* This, according to the Supreme Court, "would reduce [WC] benefits to nothing more than a disability or death benefit payable only because of the employee status of the

---

4. Before the 1972 amendment, Section 301(c) defined injury as " '[t]he terms 'injury' and 'personal injury,' as used in this act, shall be construed to mean only violence to the physical structure of the body, and such disease or infection as naturally results therefrom.' " *University of Pittsburgh v. Workmen's Compensation Appeal Board,* 49 Pa.Cmwlth. 347, 405 A.2d 1048, 1050 (1979) (quoting *former* Section 301(c), 77 P.S. § 411), abrogated as rec-

ognized in *Lilley v. Workmen's Compensation Appeal Board (York International Corporation),* 150 Pa.Cmwlth. 555, 616 A.2d 91, 95 n. 1 (1992). That definition now reads "[t]he terms 'injury' and 'personal injury,' as used in this act, shall be construed to mean an injury to an employe, regardless of his previous physical condition ... arising in the course of his employment and related thereto...." 77 P.S. § 411.

claimant—and not because the injury was caused by his employment." *Id.*

■ Following *Martin,* our Supreme Court further refined this standard. In *Wilson v. Workmen's Compensation Appeal Board (Aluminum Company of America),* 542 Pa. 614, 669 A.2d 338 (1996), our Supreme Court stated that " '[e]ven if a claimant adequately identifies actual (not merely perceived or imagined) employment events which have precipitated psychiatric injury, the claimant must still prove the events to be abnormal before he can recover.' " *Id.* at 344 (quoting *Antus v. Workmen's Compensation Appeal Board (Sawhill Tubular Division, Cyclops Industries, Inc.),* 155 Pa.Cmwlth. 576, 625 A.2d 760, 766 (1993), *aff'd,* 536 Pa. 267, 639 A.2d 20 (1994)). Certain events are considered normal working conditions associated with employment, such as the loss of employment, an offer of a position with less responsibility, the retroactive application of performance standards followed by a negative performance evaluation, or a promotion with more responsibility, and mental injuries caused by such events are not compensable under the Act. *See, e.g., Pennsylvania Human Relations Commission v. Workmen's Compensation Appeal Board (Blecker),* 546 Pa. 83, 683 A.2d 262, 269 (1996) (retroactive application of performance standards followed by a negative performance evaluation); *Hershey Chocolate Company v. Commonwealth,* 546 Pa. 27, 682 A.2d 1257, 1264 (1996) (increase in job responsibilities related to the claimant's promotion); *Wilson,* 669 A.2d at 345–46 (choice of loss of employment or a job with fewer responsibilities and a corresponding "perception that a temporary job is demeaning"). Moreover, employers are not expected "to provide emotionally sanitized working conditions." *RAG (Cyprus) Emerald Resources, L.P. v. Workers' Compensation Appeal Board (Hopton),* 590 Pa. 413, 912 A.2d 1278, 1288 (2007). "In assessing whether work conditions are abnormal, we must recognize that the work environment is a microcosm of society. It is not a shelter from rude behavior, obscene language, incivility, or stress." *Philadelphia Newspapers, Inc. v. Workmen's Compensation Appeal Board (Guaracino),* 544 Pa. 203, 675 A.2d 1213, 1219 (1996).

■ Our Supreme Court has explained that these cases:

reflect the view that there is a degree of uncertainty inherent in any employment situation, as in life itself, such that a[ ] [claimant's] individual, subjective reaction to these ordinary vicissitudes [5] is not the type of condition which the legislature intended to require compensation for because it is not, in the common understanding, an injury.

*Davis v. Workers' Compensation Appeal Board (Swarthmore Borough),* 561 Pa. 462, 751 A.2d 168, 177 (2000). In essence, *Martin* and its progeny require a claimant to present evidence establishing that the mental injury is, in fact, caused by an actual work-related event that is not a normal condition of the claimant's employment.

Most recently, our Supreme Court addressed the abnormal working conditions standard in *Payes II.* In *Payes II,* the claimant, a state trooper, filed a claim petition asserting that he sustained PTSD after he struck and killed a pedestrian who had run in front of his patrol car while he was travelling to his barracks to begin his shift. *Payes II,* 79 A.3d at 545. The WCJ in that case found that state troopers "are

---

5. "Vicissitude" is "the quality or state of being changeable or in flux." Webster's Third New International Dictionary 2550 (2002).

exposed to vehicle accidents, mayhem, bodily injuries, death, murder, and violent acts in the normal course of their duties." *Id.* at 547 (internal quotation marks omitted). However, the WCJ found that state troopers are not normally exposed to, *inter alia,* "a mentally disturbed individual running in front of a Trooper's vehicle while he is operating the vehicle, for no apparent reason." *Id.* (internal quotation marks omitted). Based on these findings, the WCJ concluded that the events "were not normal for a state trooper but instead were extraordinary and unusual" and the claimant's mental injury was the result of an abnormal working condition and, thus, compensable. *Id.* (internal quotation marks omitted).

The employer appealed, and the Board reversed the WCJ's order, holding that "[w]hile being involved in a fatal accident may be traumatic and not routine for a state trooper, we cannot agree that this incident constitutes an abnormal working condition given the nature of [the claimant's] stressful and perilous profession." *Id.* (internal quotation marks omitted). This Court affirmed the denial of benefits, concluding that the events "may have been unusual, but they were not so much more stressful and abnormal than the already highly stressful nature of [the c]laimant's employment to render an award of benefits appropriate." *Payes v. Workers' Compensation Appeal Board (Commonwealth of PA/State Police),* 5 A.3d 855, 862 (Pa. Cmwlth.2010), *rev'd, Payes II (Payes I).* This Court further stated that troopers "can be expected to be witness to horrible tragedy." *Payes I,* 5 A.3d at 861. We evaluated the constituent parts of the event, noting that state troopers respond to motor vehicle accidents, during that response the trooper may be subjected to traumatic visuals such as injuries and death, and a trooper may be required to take someone's life. *Id.* We concluded that, "[b]ut for the part that [the c]laimant was the one who struck the woman with his vehicle, there would be no question that any resulting psychological injury would not be compensable" and "[t]his fact . . . does not take [the c]laimant's mental injuries that would ordinarily be noncompensable and render an award of benefits appropriate." *Id.* at 862.

■ Upon appeal the Supreme Court reversed, noting that because the question of whether working conditions are normal is a mixed question of law and fact, " 'the answer must be evaluated on a case-by-case basis because certain mixed questions are more heavily weighted toward fact, while others are more heavily weighted toward law. The more fact intensive the inquiry, the more deference a reviewing court should give to the [WCJ's] findings below.' " *Payes II,* 79 A.3d at 549 n. 3 (quoting *Gentex Corporation v. Workers' Compensation Appeal Board (Morack),* 611 Pa. 38, 23 A.3d 528, 534 n. 10 (2011) (emphases omitted)). "Although the ultimate determination of whether [the claimant] has established 'abnormal working conditions' is a question of law" subject to appellate review, " '[mental] injury cases are highly fact-sensitive[,] and for actual working conditions to be considered abnormal, they must be considered in the context of specific employment.' " *Id.* at 552 (emphasis omitted) (third alteration in original) (quoting *Wilson,* 669 A.2d at 343). The Supreme Court cautioned, however, that in performing this review the courts must limit their review of the WCJ's factual findings " 'to determining whether they are supported by the evidence and [these findings may be] overturn[ed] only if they are arbitrary and capricious. Thus, . . . appellate review of this question [is] a two-step process of reviewing the factual findings and then the legal conclusion.' " *Id.* (alterations in original) (quoting *RAG,* 912

A.2d at 1284 n. 6). When considering the question of whether a working condition is normal, while there is no " 'bright line test or . . . generalized standard,' " *id.* (quoting *RAG*, 912 A.2d at 1288), the Supreme Court, nonetheless, provided multiple iterations of a standard that can be employed, such as requiring the claimant to "establish that he was subject to conditions to which an employee in his position is not normally subject," and that his is a "reaction to a highly unusual and singular event." *Id.* at 556.

The Supreme Court held that the WCJ's factual finding that the claimant's mental injury arose from "a singular, extraordinary event occurring during [the claimant's] work shift . . . was founded on substantial evidence of record" and that "this factual finding fully support[ed] the WCJ's legal conclusion that [the claimant's] injury stemmed from an abnormal working condition." *Id.* at 553–54. The Supreme Court concluded that this Court erred when it reformulated the WCJ's finding "into unrelated component parts, where each part, standing on its own, might be safely determined to be a 'normal' working condition for a police officer" because the WCJ found that the factual scenario was of a completely different nature. *Id.* at 554. It indicated that this Court's discussion was "a potentiality with no relation to what happened in this case" and, therefore, "represent[ed] a false analogy." *Id.* Accordingly, the Supreme Court held that the claimant had established that the single incident, as described by the WCJ, was abnormal and, "as a matter of law, the WCJ's determination, . . . correctly applied the WCJ's factual findings to the appropriate legal construct, [and was] consistent with . . . precedent." *Id.* at 556. Therefore, the Supreme Court ordered the reinstatement of the WCJ's order granting the claimant benefits. *Id.* at 557.

## III. Applying this Precedent to the April 28, 2008 Armed Robbery

 As in all cases where a claimant seeks WC benefits via claim petition, Claimant has the initial burden of proving that he has suffered a mental injury within the course and scope of his employment, and the injury results in a loss of earning power, i.e., disability. *Bethlehem Steel Corporation v. Workmen's Compensation Appeal Board (Baxter)*, 550 Pa. 658, 708 A.2d 801, 802 (1998). However, once he does that, under our precedent as described, Claimant also has the additional burden of proving that the mental injury he has suffered is "other than a subjective reaction to normal working conditions." *Martin*, 568 A.2d at 164–65 (internal quotation marks omitted).

In this case Employer does not, before this Court, contest that Claimant suffered a mental injury in the course and scope of his employment. The WCJ found that Claimant's PTSD was caused by the April 28, 2008 armed robbery of Employer's store, and Employer's expert acknowledged that Claimant's PTSD was the "direct result of the April 28, 2008" armed robbery. (FOF ¶¶ 4, 7, 12.) Therefore, the only issue before this Court is whether Claimant has met the additional burden of proving that the mental injury he has suffered is "other than a subjective reaction to normal working conditions." *Martin*, 568 A.2d at 164–65 (internal quotation marks omitted). In accordance with the remand instructions, we must determine whether the WCJ's findings of fact are supported by substantial evidence and support the WCJ's legal conclusion that the robbery was an abnormal working condition.

On appeal, Employer challenges findings of fact 11 and 13. In finding of fact 11, the WCJ "accept[ed Employer's] fact testimony only to the extent to which it is consis-

tent with her findings in this case. To the extent to which [Employer's] evidence is not consistent with Claimant's testimony, [Employer's] evidence is rejected." (FOF ¶ 11.) In this finding, the WCJ weighed the evidence presented by the parties and found Claimant's evidence more credible than Employer's evidence. It is well-settled that matters of credibility and evidentiary weight are within the province of the WCJ. *Kraeuter v. Workers' Compensation Appeal Board (Ajax Enterprises, Inc.)*, 82 A.3d 513, 517 n. 1 (Pa.Cmwlth.2013).

In finding of fact 13, the WCJ indicated, in pertinent part, that "despite the incidents of robberies at [Employer's] state liquor stores, robbery at gunpoint is an abnormal working condition" and that "despite the evidence that Claimant attended training on workplace violence ... in 2001 and 2005 and [was] provided pamphlets and educational tools on the handling of a robbery—workplace violence, *which includes robberies and theft,* ... is an abnormal working condition." (FOF ¶ 13 (emphasis in original).) The WCJ further found "the evidence relative to the training of employees in ways of behaving during a robbery that best ensures *safety* to the person to whom the gun is pointed" competent, but the WCJ did "not find that [training] entirely relevant to defend the type of injury that Claimant sustained on April 28, 2008." (FOF ¶ 13 (emphasis in original).) The WCJ concluded that "[r]obbery by gunpoint to the back of the head is ... no[t] a normal working condition." (FOF ¶ 13.) Thus, finding of fact 13 includes both factual findings and the WCJ's legal conclusion that the April 28, 2008 armed robbery was an abnormal working condition, and we will review it to determine if it is supported by substantial evidence and "correctly applie[s] ... [these facts] to the appropriate legal construct." *Payes II,* 79 A.3d at 556.

The WCJ found Claimant credible that, on April 28, 2008, a masked gunman robbed Employer's store, showing Claimant two guns, instructing Claimant to remove the money from the safe and a lockbox to give to the gunman. (FOF ¶¶ 2, 10.) The gunman directed Claimant to unlock the store's back emergency exit door, "held a gun to the back of Claimant's head," prodding Claimant's head with the gun and threatening Claimant when he expressed anxiety, tied Claimant and his co-worker to a chair with duct tape, warned that he might return, and left the store using the store's back emergency exit door. (FOF ¶¶ 2, 10.) Claimant had to extricate himself from the duct tape and call the police and his supervisors to report the robbery. (FOF ¶ 2.) The WCJ found that, in over thirty years of employment with Employer, Claimant had never been involved in workplace violence and had never had a gun pointed to the back of his head by a masked gunman. (FOF ¶ 10.) The WCJ further found that this workplace violence "is an abnormal working condition," that although workplace violence occurs that fact does not "place workplace violence into the realm of a normal working condition," and that "[r]obbery by gunpoint to the back of the head is neither a normal societal occurrence, nor a normal working condition." (FOF ¶¶ 10, 13).

Employer does not challenge that the armed robbery occurred as Claimant described on April 28, 2008. Employer argues that, because Claimant had received training involving workplace violence and that robberies had occurred at Employer's other locations, the WCJ erred in finding the armed robbery Claimant experienced to have been "an abnormal working condition." Employer asserts that these factors were the basis for denying WC benefits for a mental injury in *McLaurin v. Workers' Compensation Appeal Board (SEPTA),*

980 A.2d 186 (Pa.Cmwlth.2009), and the WCJ's conclusion is contrary to this precedent. Employer also argues that the WCJ erred by basing her award on a finding that workplace violence, and robberies in particular, are *per se* abnormal.

Initially, a review of the WCJ's findings reveals that the WCJ described the April 28, 2008 robbery in detail and concluded that "[r]obbery by gunpoint to the back of the head is ... no[t] a normal working condition." (FOF ¶¶ 2, 10, 13.) The WCJ's findings described, as also occurred in *Payes II*, "a singular, extraordinary event occurring during [Claimant's] work shift" that caused Claimant's PTSD. *Payes II*, 79 A.3d at 553. Thus, the WCJ based the award of benefits to Claimant on the actual events that occurred and not on a finding that all robberies were abnormal.

At issue is whether, because Claimant had received training involving workplace violence and because robberies had occurred at Employer's other locations, the WCJ erred in finding the armed robbery Claimant experienced to have been "an abnormal working condition." The employer in *Payes II* also presented evidence regarding the training that the claimant, a state trooper, received related to managing stress, responding to automobile accidents, and rendering first aid to victims at a crash site, as well as evidence that state troopers are exposed to automobile accidents and another state trooper had struck and killed a pedestrian who ran in front of his patrol vehicle. *Payes II*, 79 A.3d at 546. The WCJ in *Payes II* credited that testimony. *Id.* Nevertheless, notwithstanding the training and other occurrences regarding fatal automobile accidents, our Supreme Court held that the incident that caused the claimant's PTSD was "a singular extraordinary event" for this particular trooper and, therefore, that incident constituted an abnormal working

condition. *Id.* at 553. Our Supreme Court indicated that the employer's evidence that another "state trooper had once struck a pedestrian [did] not make the incident here a 'normal' working condition" as "[a]bnormal working conditions need not be 'unique' working conditions." *Id.* at 556 n. 8.

Employer's workplace violence training and evidence of prior robberies in the case at bar is very similar to the training and evidence that was presented in *Payes II*. Claimant had received some training regarding how to safely react to robberies, and there had been robberies at Employer's other stores. However, an examination of the evidence pertaining to Claimant's training in workplace violence reveals that much of the training was focused on workplace violence, in general, rather than on armed robberies specifically. For example, Claimant received a copy of Management Directive 205.33 (Management Directive) issued by the Governor of Pennsylvania discussing workplace violence in all of the agencies within the Governor's jurisdiction. (Management Directive, R.R. at 76a–77a.) This Management Directive covered a variety of potential workplace violence situations, including internal workplace violence, bomb threats, violence associated with domestic relationships, robbery, and phone threats. (Management Directive, R.R. at 76a–84a.) The Management Directive described how individuals could recognize potentially violent situations and handle such situations to ensure the safety of those in the workplace. (Management Directive, R.R. at 76a–84a.)

Employer implemented this Management Directive by providing training to its employees, particularly its store managers, which covered the general workplace violence information referenced in the Management Directive. (Building a Safe

Workplace: Preventing Workplace Violence, R.R. at 85a–117a.) Employer did provide training on armed robberies specifically, but its expert, Mr. Keller, indicated that the training focused on ensuring the safety of employees. (Keller's Dep. at 6, R.R. at 302a.) Further, Mr. Keller described the training regarding safety between Employer's district manager and the retail store managers as being about "robberies, flood, fires...." (Keller's Dep. at 9, R.R. at 305a.) Although Employer argues that these training materials support its conclusion that armed robberies are normal working conditions for its employees, its own materials reference these events as infrequent occurrences, (Things You Need to Know About Armed Robbery at 1, R.R. at 119a), and emergencies, likening robberies to "flood, fire or some other disaster," (Ex. D–Keller–1, R.R. at 325a, 327a).

A person reviewing this evidence, and the reasonable inferences deducible therefrom in the light most favorable to Claimant, which we are required to do as he was successful below, could accept it as adequate to support the WCJ's finding of fact that such training was not entirely relevant, and not dispositive, of whether the armed robbery Claimant experienced was a normal working condition. *3D Trucking Co., Inc. v. Workers' Compensation Appeal Board (Fine & Anthony Holdings International)*, 921 A.2d 1281, 1288 (Pa.Cmwlth. 2007).

To further support her conclusion that the April 28, 2008 armed robbery is not a normal working condition for this Claimant, the WCJ also specifically found as fact that Claimant had never experienced a robbery in the over thirty years he worked for Employer:

Claimant is an employee of [Employer] for over 30 years, and was never involved in workplace violence at a facility at which he was responsible prior to April 28, 2008. Prior to April 28, 2008 Claimant never had a gun pointed to the back of his head by a masked robber seeking to direct and control Claimant's actions and behaviors for the purpose of robbing money from the store, and ensuring his own safe escape through the back emergency exit door.

(FOF ¶ 10.) This finding of fact is supported by Claimant's credible testimony, (FOF ¶ 2; Hr'g Tr. at 7–10, 22, 45, R.R. at 32a–35a, 47a, 70a), which constitutes substantial evidence to support the WCJ's findings, *Brewer v. Workers' Compensation Appeal Board (EZ Payroll & Staffing Solutions)*, 63 A.3d 843, 849 (Pa.Cmwlth. 2013).

Finally, *McLaurin* does not require a different result. *McLaurin* was decided before our Supreme Court's decision in *Payes II*, which clarified that abnormal working condition cases must focus on the particular incident in question when determining whether that incident was a "singular extraordinary event," even where the claimant is employed in a highly stressful or dangerous position. *See Payes II*, 79 A.3d at 555 (holding that, even where a "claimant generically belongs to a profession that involves certain levels or types of stress," the abnormal working condition analysis does not end because, if it did, "the court's analysis would not rest upon the unique factual findings of the case"). Moreover, even without considering *Payes II*, our holding is not otherwise inconsistent with *McLaurin*. In both *McLaurin* and the case before us, deference was given to the WCJ's factual findings and credibility determinations. In *McLaurin*, the WCJ expressly credited the testimony of *employer's* witnesses "as to the frequency of assaults on operators[,] and the company's necessary efforts to train the operators in methods of dealing with dangerous passengers," and credited *employer's* doc-

umentary evidence, as well as the claimant's own testimony regarding his prior experiences of physical danger while at work. *McLaurin,* 980 A.2d at 190. The WCJ, in *McLaurin,* evaluated and considered the actual incident that occurred within the framework of this *credited* evidence of the high frequency of life-threatening passenger disturbances and employer-provided training and determined that incident was normal. *Id.* In the case at bar, the WCJ expressly credited Claimant's evidence that, in over thirty years of working, he had never experienced workplace violence, and did not credit or find relevant Employer's contrary evidence. (FOF ¶¶ 10–13.) Accordingly, factually and legally *McLaurin* is distinguishable.

### IV. Conclusion

Because the WCJ's findings of fact are supported by substantial evidence, we must defer to those findings in accordance with the Supreme Court's remand order in this matter and *Payes II.* Here, the WCJ's findings described "a singular, extraordinary event occurring during [Claimant's] work shift" that caused Claimant's PTSD, *Payes II,* 79 A.3d at 553, and those findings support the WCJ's legal conclusion that Claimant established that the specific armed robbery here was not a normal working condition. Accordingly, we affirm the Board's Order.

Judges SIMPSON and LEAVITT did not participate in this decision.

### *ORDER*

**NOW,** December 30, 2014, the Order of the Workers' Compensation Appeal Board entered in the above-captioned matter is hereby **AFFIRMED.**